IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | Criminal No. 3:15-CR-496-L |
| | § | |
| USPLABS, LLC (01) | § | |
| JACOBO GEISSLER (02) | § | |
| JONATHAN DOYLE (03) | § | |
| MATTHEW HEBERT (04) | § | |
| KENNETH MILES (05) | § | |
| S.K. LABORATORIES, INC. (06) | § | |
| SITESH PATEL (07) | § | |
| CYRIL WILLSON (08) | § | |

## MEMORANDUM OPINION AND ORDER

Before the court are Defendants USPlabs, LLC, Jonathan Doyle, Jacobo Geissler, and Matthew Hebert's Motion and Brief in Support of Their Motion to Suppress all Seized Digitally Stored Date (Doc. 377), filed December 26, 2017;[1] Defendants S.K. Laboratories' and Patel's Motion to Suppress Evidence Seized During the Eleven Month and Apparent Ongoing Search of Their Digital Data (Doc. 381), filed December 29, 2017; Defendants' Joint Motion to Suppress Evidence Seized from the November 6, 2013 Search of 5420 E. La Palma Avenue, Anaheim, California Based upon Overly Broad Warrant and Seizure and Lack of Probable Cause (Doc. 384), filed December 29, 2017; Defendants' Joint Motion to Suppress iPhone and Digital Device Searches as Fruits of Passcode Statements Obtained in Violation of Fifth Amendment (Doc. 385), filed December 29, 2017; and Defendants S.K. Laboratories, Inc. and Sitesh Patel's Joint Supplemental Motion to Suppress Evidence Seized from the November 6, 2013 Search of 5420 E.

---

[1] On September 10, 2018, with leave of court, Defendants USPlabs, LLC, Jonathan Doyle, Jacobo Geissler, and Matthew Hebert filed a Supplemental Brief in Support of Their Motion to Suppress (Doc. 552). On September 21, 2018, the Government filed its response (Doc. 560).

La Palma Avenue, Anaheim, California Based Upon Overly Broad Warrant and Seizure and Lack of Probable Cause, filed December 29, 2017 (Doc. 386).

Having carefully considered the motions, supplemental briefs, responses, evidence, record, and applicable law, and for the reasons that follow, the court **denies** Defendants USPlabs, LLC, Jonathan Doyle, Jacobo Geissler, and Matthew Hebert's Motion and Brief in Support of Their Motion to Suppress all Seized Digitally Stored Date (Doc. 377); **denies as moot** Defendants S.K. Laboratories' and Patel's Motion to Suppress Evidence Seized During the Eleven Month and Apparent Ongoing Search of Their Digital Data (Doc. 381); **denies as moot** Defendants' Joint Motion to Suppress Evidence Seized from the November 6, 2013 Search of 5420 E. La Palma Avenue, Anaheim, California Based Upon Overly Broad Warrant and Seizure and Lack of Probable Cause (Doc. 384); **denies as moot** Defendants' Joint Motion to Suppress iPhone and Digital Device Searches as Fruits of Passcode Statements Obtained in Violation of Fifth Amendment (Doc. 385); and **denies as moot** Defendants S.K. Laboratories, Inc. and Sitesh Patel's Joint Supplemental Motion to Suppress Evidence Seized from the November 6, 2013 Search of 5420 E. La Palma Avenue, Anaheim, California Based Upon Overly Broad Warrant and Seizure and Lack of Probable Cause (Doc. 386).

I.    **Factual Background**

A.    **The Defendants**

Defendants are USPlabs, LLC ("USPlabs"), a dietary supplement own-label distributor based in Dallas, Texas; S.K. Laboratories, Inc. ("S.K. Labs"), a California corporation that manufactured USPlabs' supplements and consulted on supplement formulation; Jacobo Geissler ("Geissler"), a co-founder, co-owner, and chief executive officer of USPlabs; Jonathan Doyle ("Doyle"), a co-

founder, co-owner, and president of USlabs;[2] Matthew Hebert ("Hebert"), a co-owner of USPlabs and responsible for product packaging design; CyrilWillson ("Willson"), also known as "Erik White," a consultant to USPlabs, formerly a co-owner; Kenneth Miles ("Miles"), USPlabs' compliance officer; and Sitesh Patel ("Patel"), a vice-president and employee of S.K. Labs. Defendants USPlabs, Geissler, Doyle, and Hebert are sometimes collectively referred to as the "USPlabs Defendants," and Defendants Patel and S.K. Labs are sometimes collectively referred to as the "S.K. Labs Defendants.

### B.     The Indictment

On January 5, 2016, the Government filed an 11-Count Superseding Indictment ("the Indictment") (Doc. 95) against Defendants. The charges in the Indictment stem from Defendant USPlabs' sale of dietary/weight loss supplements, which were manufactured by Defendant S.K. Labs. Doc. 95 at 5-6. The Indictment generally alleges that Defendants conspired to import and sell synthetic dietary supplements but falsely marketed the products as plant-based under the theory that federal regulatory agencies would be less likely to question the importation of plant extracts, and retailers would be more likely to sell such products. Doc. 95 at 6. The Indictment further alleges that, during the conspiracy, certain Defendants created false documentation to import a synthetic substance—1,3-dimethylamylamine, known as DMAA—that they represented was a geranium plant extract. According to the Indictment, certain Defendants then used the DMAA in some of their supplements, which thereafter became best-selling products. Doc. 95 at 7, 14-15.

---

[2] On February 15, 2019, Defendant Jonathan Doyle and the Government entered into a plea agreement under which, among other things, Doyle agreed to enter a plea of guilty to Count 7, and the Government agreed to dismiss all remaining charges against him. *See* Corrected Plea Agreement (Doc. 629). Accordingly, the Motion to Suppress with respect to Doyle is moot.

It is further alleged that when DMAA became the subject of controversy in the dietary supplement industry, USPlabs, through Defendant Geissler, began importing other chemicals under false labels to determine whether they could be used in new dietary supplements. Doc. 95 at 9. Two such ingredients were aegeline, a synthetic version of an extract from a tree native to India, and the pulverized roots of a Chinese herb, cynanchum auriculatum ("CA"), both of which USPlabs is alleged to have purchased from China using fake certificates of analysis ("COA").[3] The first aegeline-containing version of one of Defendants' supplements was OxyElite Pro "New Formula" ("OEP-NF"). Doc. 95 at 9-10. The second version of the supplement contained both aegeline and CA and was called OxyElite Pro "Advanced Formula" ("OEP-AF"). Doc. 95 at 10.

As alleged in the Indictment, in the fall of 2013, an outbreak of injuries was reported to be associated with USPlabs' aegeline-based products after numerous consumers in Hawaii experienced liver-related symptoms, including liver failure. Doc. 95 at 11. Following an inspection by the United States Food and Drug Administration ("FDA"), USPlabs agreed to cease distributing the OEP products but is alleged to have instead pushed sales as fast as possible. Doc. 95 at 11. The Indictment also alleges that USPlabs issued a press release falsely stating that the ingredients in OEP had been researched and showed no negative liver effects, even though Defendants Geissler and Willson knew that a study had shown such negative side effects. Doc. 95 at 11. Eventually, Geissler instructed that both aegeline and CA be removed from the product going forward. Doc. 95 at 11.

---

[3] The Food and Drug Administration ("FDA") defines a COA as "a document, provided by the supplier of a component prior to or upon receipt of the component, that documents certain characteristics and attributes of the component." Guidance for Industry Current Good Manufacturing Practice in Manufacturing, Packaging, Labeling, or Holding Operations for Dietary Supplements, 2010 WL 5574459, at *9 (Dec. 1, 2010).

The Indictment contains the following charges[4]:

**Count 1** – *Conspiracy to Commit Wire Fraud* (as to all Defendants except Miles), 18 U.S.C. §§ 1343, 1349; Doc. 95 at 12-17. This count involves Defendants' alleged use of false shipping labels, false COAs, and false shipping documentation to support misleading product labeling in relation to statements that the respective supplements contained "natural" DMAA derived from geranium and CA "extract" (as opposed to CA "root").

**Counts 2-5** – *Wire Fraud*, 18 U.S.C. § 1343 (as to all Defendants except Miles); Doc. 95 at 18-19. These counts involve Defendants' alleged transmission in interstate commerce, by means of wire communications and writing, of false and fraudulent COAs, instructions to create false documents, and other fraudulent statements contained in e-mails.

**Count 6** – *Obstruction of an Agency Proceeding* (as to Defendants USPlabs, Geissler, Doyle, and Hebert only), 18 U.S.C. §§ 2, 1505; Doc. 95 at 20-21. This count charges that, during the FDA investigation regarding whether an outbreak of liver injuries was associated with USPlabs' products containing aegeline, Defendants USPlabs, Geissler, Doyle, and Hebert continued to distribute OEP products despite representing to the FDA that they would cease distribution, and attempted to impede the FDA's investigation by failing to provide material information about OEP, the anticipated shipments of OEP, and promotional activities for OEP.

**Count 7** – *Conspiracy to Introduce Misbranded Food into Interstate Commerce with an Intent to Defraud and Mislead*, 18 U.S.C. § 371; 21 U.S.C. §§ 331(a), 333(a)(2) (as to all Defendants except Miles); Doc. 95 at 22-24. This count alleges that certain Defendants conspired to avoid law enforcement attention and match imported substances with false product labeling by instructing Chinese chemical sellers to falsely label numerous chemical powders they sent to USP, including "geranium flower powder extract" and CA root "extract."

**Count 8** – *Introduction of Adulterated Food into Interstate Commerce with an Intent to Defraud and Mislead* (as to Defendants USPlabs and Geissler only), 21 U.S.C. §§ 331(a), 333(a)(2); 18 U.S.C. § 2; Doc. 95 at 25. This count alleges that Defendants USPlabs and Geissler, aiding and abetting each other, with the intent to defraud and mislead, caused the shipment of misbranded OEP-AF in interstate commerce by using a label falsely declaring that CA "extract" was an ingredient, even though it was not contained in the product.

---

[4] The Indictment spells out the number of each count rather than using Arabic numerals, for example, "Count One," instead of "Count 1." The parties sometimes refer to the counts with Arabic numerals and other times spell out the number of each count. For purposes of consistency, the court will use Arabic numerals when referring to the counts in the Indictment, except when quoting the exact title of a motion.

**Count 9** – *Introduction of Misbranded Food into Interstate Commerce* (as to Defendants Doyle, Hebert, Miles, S.K. Labs, and Patel only), 21 U.S.C. §§ 331(a), 333(a)(2); Doc. 95 at 26. This count alleges that Defendants Doyle, Hebert, Miles, S.K. Labs, and Patel caused the shipment of misbranded OEP-AF in interstate commerce when the food was misbranded under the Food Drug and Cosmetic Act ("FDCA") by using a false label declaring that CA "extract" was an ingredient, even though it was not contained in the product.

**Count 10** – *Introduction of Adulterated Dietary Supplement into Interstate Commerce*, 21 U.S.C. §§ 331(a), 333(a)(1), and 342(f)(1)(A)(I) (as to all Defendants except Willson); Doc. 95 at 27. This count alleges that Defendants caused the shipment of adulterated OEP-NF in interstate commerce, as the supplement "presented a significant or unreasonable risk of illness or injury under conditions of use recommended or suggested in labeling."

**Count 11** - *Conspiracy to Commit Money Laundering* (as to Defendants USPlabs, Geissler, Doyle, and Hebert only), 18 U.S.C. § 1956(h); Doc. 95 at 28-29. This count alleges that Defendants USPlabs, Geissler, Doyle, and Hebert conspired to transfer over $230,000,000 of proceeds obtained through wire fraud and conspiracy in a manner designed to conceal the true source and nature of the criminally derived funds.

Defendants Doyle, Miles, Patel and S.K. Labs have entered into plea agreements with the Government. The court, therefore, will confine its analysis to the arguments raised by the remaining movants.

### C.  The Search Warrants

Agents executed four search warrants as part of the investigation that led to this prosecution. Three of those warrants related to USPlabs' property, namely: a November 1, 2013 warrant signed by United States Magistrate Judge Renée Harris Toliver and executed on November 6, 2013, at USPlabs' warehouse offices in Dallas, Texas; a November 6, 2013 warrant signed by United States Magistrate Judge David L. Horan and executed that same day at Geissler's residence in Dallas, Texas; and a December 26, 2013 stored communications warrant signed by United States Magistrate Judge Paul D. Stickney and executed pursuant to 18 U.S.C. § 2703 on USPlabs' e-mail provider, App River. The fourth search warrant related to S.K. Labs' property, a November 6, 2013 warrant

signed by United States Magistrate Judge Arthur Nakazato and executed at the S.K. Labs' company headquarters in Anaheim, California that same day. *In light of the anticipated guilty pleas by Patel and S.K. Labs scheduled for Monday, February 25, 2019, the court will not address the fourth search warrant, and it will deny as moot all four motions to suppress filed by them.*

The affidavits used in the applications to obtain the three warrants related to USPlabs' property were similar. Each affidavit described a company that allegedly sold adulterated products containing an ingredient, DMAA, that either could not be used in dietary supplements or was a new ingredient for which Defendants had not provided the required notice to FDA. Doc. 377-3 at 14-16; Doc. 377-4 at 10-12; Doc. 377-5 at 9-11. The affidavits explained that following an FDA inspection of USPlabs in July 2010, the FDA cited the company for failure to comply with regulations for the legal manufacture of dietary supplements. Doc. 377-3 at 14-15; Doc. 377-4 at 10; Doc. 377-5 at 10. The affidavits also explained that USPlabs' promise of corrective action was never realized. *Id.* The affidavits went on to explain how USPlabs openly ignored the law by continuing to market products containing DMAA after the FDA had told them that such supplements were illegal. Doc. 377-3 at 16; Doc. 377-4 at 11; Doc. 377-5 at 11.

Following a government enforcement action against Defendants' DMAA products, the affidavits explained that Defendants began selling a product containing a different synthetic compound, called aegeline, without notifying the FDA about the new dietary ingredient. Doc. 377-3 at 15-17, 19-20; Doc. 377-4 at 11-12, 14-15; Doc. 377-5 at 10-12, 14-15. The affidavits described how aegeline was implicated in a suspected outbreak of severe liver injuries. Doc. 377-3 at 16, 19-21; Doc. 377-4 at 12, 15-17; Doc. 377-5 at 11-12, 14-16. The affidavits explained that, as of October 24, 2013, thirteen samples had been tested, including OxyElite Pro, OxyElite Pro Advanced, OxyElite Pro Powder, OxyElite Powder, and Versa-1. Six of the thirteen samples were

obtained from individuals experiencing adverse effects. The FDA Forensic Chemistry Center ("FCC") determined that all thirteen samples tested positive for aegeline. *Id.* The affidavits explained that there was probable cause to believe that Defendants' shipments of aegeline and the finished product were potentially illegal under the FDCA. Doc. 377-3 at 19-21; Doc. 377-4 at 14-17; Doc. 377-5 at 14-16.

The affidavits also provided detailed information showing that USPlabs used electronic communications and computers to conduct its business and explained how an FDA Consumer Safety Officer received electronic evidence throughout her inspection of USPlabs' facility, including product batch records and studies on the toxicity of aegeline conducted by the company's third-party laboratory. Doc. 377-3 at 18-19; Doc. 377-4 at 14; Doc. 377-5 at 14. The affidavits provided further that the FDA communicated with Defendants Geissler and Miles via e-mail on numerous occasions, and that these e-mails were received from USPlabs' internal e-mail address. Doc. 377-3 at 19; Doc. 377-4 at 14; Doc. 377-5 at 14.

Further, the affidavits provided information regarding the frequency with which Geissler conducted USPlabs' business from his residence. All three warrant affidavits noted that Geissler frequently worked remotely and did not typically come into the office. Doc. 377-3 at 18; Doc. 377-4 at 14; Doc. 377-5 at 13. The warrant affidavit for Geissler's home explained that Geissler corresponded regularly with USPlabs' employees about business matters from his residence using an off-site computer. Doc. 377-4 at 17. The affidavit further stated that USPlabs' Chief Financial Officer explained that Geissler often worked from his residence on USPlabs' business and corresponded with her by e-mail from that location. *Id.*

With respect to the warrant application for USPlabs' warehouse offices and the warrant application for Geissler's home, the warrant applications explained how the agents intended to

image digital devices found at the search warrant premises for off-site review.  Doc. 377-3 at 21-27;

Doc. 377-4 at 18-24.  The affidavits explained that an off-site review was necessary for all the seized

digital devices because (i) review of electronic evidence can take weeks or even months; (ii) it is

necessary to review the digital media in a controlled environment with proper tools available; and

(iii) the records sought under the warrant could be stored in a variety of formats that may require

off-site reviewing with specialized forensic tools.  Doc. 377-3 at 25-27; Doc. 377-4 at 22-23.  These

two warrants also contained attachments with detailed lists of evidence to be seized.  Doc. 377-3 at

6-7; Doc. 377-4 at 30-31.

Attachment B to the application for the search warrant of USPlabs' warehouse offices in

Dallas, Texas, detailed the evidence to be seized, and provided as follows:

> The search will be for evidence of violations of 21 U.S.C. 331 (a), causing the
> introduction of an adulterated food into interstate commerce and 18 U.S.C. 371,
> conspiracy to cause the introduction of an adulterated food into interstate commerce.
>
> The items to be seized are:
>
> a.  Any and all adulterated food, including all products labeled or purported to
> contain Aegeline.
>
> b.  All products labeled or otherwise designated as OxyElite Pro, OxyElite Pro
> Advanced, OxyElite Pro Powder, OxyElite Powder, and Versa-1.
>
> c.  Any and all promotional material, brochures, pamphlets, labels and labeling for
> OxyElite Pro, OxyElite Pro Advanced, OxyElite Pro Powder, OxyElite Powder, and
> Versa-1.
>
> d.  Any and all records of the processing, packing, shipping, holding, distribution,
> formulation, manufacturing, the transportation, receipt, purchase, acquisition,
> transfer, possession, offer to purchase, offer to sell, or sale of aegeline-containing
> products including OxyElite Pro, OxyElite Pro Advanced, OxyElite Pro Powder,
> OxyElite Powder, and Versa-1 and/or any other products containing or purported to
> contain Aegeline.
>
> e.  Any and all records of correspondence or communication - including meeting
> notes, call notes, voicemail, email, contracts, licensing, letters, faxes, and other

records of communication in whatever form - related to processing, packing, shipping, holding, distribution, formulation, manufacturing, the transportation, receipt, purchase, acquisition, transfer, possession, offer to purchase, offer to sell, or sale of aegeline-containing products, including but not limited to including OxyElite Pro, OxyElite Pro Advanced, OxyElite Pro Powder, OxyElite Powder, and Versa-I

and/or any other products labeled or purported to contain Aegeline. Such records include but are not limited to records of correspondence related to aegeline-containing products including any one of the following parties: Jacob Geissler, Sitesh Patel, Kenneth Miles, Lorena Macias, Jonathon Doyle, Matthew Hebert, USP representatives, Pegasus Logistics Group representatives, SK Labs representatives, Vitatech Nutritional Sciences representatives, General Nutrition Center representatives, Vitamin Shoppe representatives, Smartchem Beijing Ltd representatives, and Siwadaka Chemical Company representatives.

f. Any and all customer files, complaint files, adverse event reports, complaint handling procedures, and any other documents related to customer communications regarding OxyElite Pro, OxyElite Pro Advanced, OxyElite Pro Powder, OxyElite Powder, and Versa- I and/or any other products labeled or purported to contain Aegeline.

g. Any and all bank records, canceled checks, deposit tickets and items, ledgers, journals, tax return information, both corporate and personal, work papers, schedules, receipts, invoices, and other financial documents related to USP Labs and/or aegeline-containing products.

h. Records and documents subject to this warrant shall include all records, whether stored on magnetic media such as tape, cassette, disk, CD, DVD, cellular device, or on a computer or other memory storage devices or any other storage media.

Doc. 377-3 (Attachment B).

Attachment B to the application for the search warrant of Geissler's home detailing the evidence to be seized is identical in all relevant respects. *Compare* Doc. 377-3 (Attachment B) *with* Doc. 377-4 (Attachment B).

The warrant affidavit for the search warrant of USPlabs' third-party e-mail host, App River, mirrored the warehouse's description of the investigation. The warrant application sought and obtained authority to seize all records associated with USPlabs' entire e-mail domain from App River. Doc. 377-5, Ex. E ¶¶ 42-47. The warrant affidavit stated that:

> Based on my training, knowledge, and experience, as well as the information
> of which I have obtained during my investigation, I believe evidence of violations
> of federal law, specifically, 21 U.S.C. § 331 (causing the introduction of adulterated
> food into interstate commerce) and 18 U.S.C. § 371 (conspiracy to cause the
> introduction of adulterated food into interstate commerce), will be located within the
> emails associated with the domain 'upslabsdirect.com' that are currently in the
> custody of App River.

*Id.* ¶ 48.

The App River warrant application's Attachment A explained that App River would give the Government an exact duplicate of "any and all records contained within any email accounts associated with the email domain 'usplabsdirect.com.'" Ex. E Att. A ¶¶ A-C. Agents would thereafter "identify and copy the information contained in those accounts and files which are authorized to be further copied as above." *Id.* ¶ D. The "accounts and files . . . authorized to be further copied as above" were all of them: "any and all records contained within any e-mail accounts associated with the e-mail domain 'usplabsdirect.com.'" *Id.* ¶ A. Under the warrant, agents seized a hard drive "containing the email account for USP Labs." E-mail Inventory Item 1 (Ex. G).

## II.    Legal Standards

### A.    The Fourth Amendment

The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and
> effects, against unreasonable searches and seizures, shall not be violated, and no
> Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and
> particularly describing the place to be searched, and the persons or things to be
> seized.

U.S. Const. amend IV.

"As the text makes clear, the ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Riley v. California*, 573 U.S. 373, 381-82 (2014) (internal quotation marks and citation omitted). "[W]here a search is undertaken by law enforcement officials to discover evidence of criminal wrongdoing, . . . reasonableness generally requires the obtaining of a judicial warrant." *Id.* (internal quotation marks and citation omitted). "A defendant normally bears the burden of proving by a preponderance of the evidence that the challenged search or seizure was unconstitutional." *United States v. Waldrop*, 404 F.3d 365, 368 (5th Cir. 2005) (citing *United States v. Guerrero-Barajas*, 240 F.3d 428, 432 (5th Cir. 2001)). "However, where a police officer acts without a warrant, the government bears the burden of proving that the search was valid." *Id.* (citation omitted).

### B.     The Exclusionary Rule

"The exclusionary rule prohibits introduction at trial of evidence obtained as the result of an illegal search or seizure." *United States v. Runyan*, 275 F.3d 449, 466 (5th Cir. 2001). The exclusionary rule also prohibits the introduction at trial of all evidence "that is derivative of an illegal search, or evidence known as the 'fruit of the poisonous tree.'" *United States v. Hernandez*, 670 F.3d 616, 620-21 (5th Cir. 2012) (citation omitted). The "fruit of the poisonous tree" doctrine applies only to evidence "derived from the exploitation of an illegal search or seizure." *United States v. Scroggins*, 599 F.3d 433, 446 (5th Cir. 2010) (citation omitted). When determining whether evidence should be suppressed under the exclusionary rule, the issue is not whether the evidence would have been discovered "but for" a constitutional violation, but instead whether it is "derived from exploitation of the illegality." *United States v. Tovar*, 719 F.3d 376, 386 (5th Cir. 2013) (citing *Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963)). "The purpose of the exclusionary rule is to deter unlawful police conduct." *United States v. Pope*, 467 F.3d 912, 916

(5th Cir. 2006). This purpose will not be served, and thus the rule is inapplicable, when evidence is obtained in "objectively reasonable good-faith reliance upon a search warrant." *Id.* (citations and internal quotation marks omitted).

### C. The Good-Faith Exception to the Exclusionary Rule

In deciding a motion to suppress evidence obtained in a search conducted pursuant to a warrant, the court must determine whether the good-faith exception to the exclusionary rule applies. *United States v. Payne,* 341 F.3d 393, 399 (5th Cir. 2003); *United States v. Pena-Rodriguez*, 110 F.3d 1120, 1129-30 (5th Cir. 1997). If the good faith exception applies, the court "need not reach the question of probable cause for the warrant unless it presents a novel question of law, resolution of which is necessary to guide future action by law enforcement officers and magistrates." *Payne*, 341 F.3d at 399 (citation and internal quotation marks omitted). If the good-faith exception does not apply, the court determines whether "the magistrate had a substantial basis for . . . concluding that probable cause existed." *Pena-Rodriguez*, 110 F.3d at 1129-30.

"Under the good-faith exception, evidence obtained during the execution of a warrant later determined to be deficient is admissible nonetheless, so long as the executing officers' reliance on the warrant was objectively reasonable and in good faith." *Payne*, 341 F.3d at 399 (citing *United States v. Leon*, 468 U.S. 897, 921-25 (1984)). This is true even if the evidence in the affidavit on which the warrant was based was not sufficient to establish probable cause. *United States v. Davis*, 226 F.3d 346, 351 (5th Cir. 2000) (citing *United States v. Shugart*, 117 F.3d 838, 843 (5th Cir. 1997)). When "probable cause for a search warrant is founded on incorrect information, but the officer's reliance upon the information's truth was objectively reasonable, the evidence obtained from the search will not be excluded" under the good-faith exception. *United States v. Looney*, 532 F.3d 392, 394 (5th Cir. 2008) (quoting *United States v. Cavazos*, 288 F.3d 706, 709 (5th Cir. 2002)).

"The issuance of a warrant by a non-biased magistrate is the 'clearest indication' that officers proceeded 'in an objectively reasonable manner, or as [courts] have sometimes put it, in objective good faith,' but the existence of such a warrant 'does not end the inquiry into objective reasonableness.'" *United States v. Triplett*, 684 F.3d 500, 504 (5th Cir. 2012) (quoting *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (some internal punctuation omitted)). "If subjective good faith alone were the test, the protections of the Fourth Amendment would evaporate, and the people would be 'secure in their persons, houses, papers, and effects,' only in the discretion of the police." *Id.* (quoting *Leon*, 468 U.S. at 915 n. 13) (internal quotation marks and citation omitted).

"The good faith exception requires answering the question of 'whether a reasonably well-trained officer would have known that the search was illegal despite the magistrate's authorization.'" *Id.* (quoting *Leon*, 468 U.S. at 922 n.23). The good-faith exception does not apply:

> (1) If the issuing magistrate/judge was misled by information in an affidavit that the affiant knew was false or would have known except for reckless disregard of the truth; (2) where the issuing magistrate/judge wholly abandoned his or her judicial role; (3) where the warrant is based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) where the warrant is so facially deficient in failing to particularize the place to be searched or the things to be seized that the executing officers cannot reasonably presume it to be valid.

*Payne*, 341 F.3d at 399-400.

### D.  Particularity Requirements

"Because indiscriminate searches and seizures conducted under the authority of 'general warrants' were the immediate evils that motivated the framing and adoption of the Fourth Amendment, that Amendment requires that the scope of every authorized search be particularly described." *Walter v. United States*, 447 U.S. 649, 657 (1980) (internal quotation marks and citation

omitted). "The requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another." *Marron v. United States*, 275 U.S. 192, 196 (1927). Otherwise stated, the Fourth Amendment proscribes "issuance of general warrants allowing officials to burrow through a person's possessions looking for any evidence of a crime." *United States v. Kimbrough*, 69 F.3d 723, 727 (5th Cir. 1995) (citing *Andresen v. Maryland*, 427 U.S. 463, 48 (1976)). "A warrant that fails to conform to the particularity requirement of the Fourth Amendment is unconstitutional." *Groh v. Ramirez*, 540 U.S. 551, 557 (2004).

"The warrant must further not be overbroad, meaning 'there must be probable cause to seize the particular things named in the warrant. This related but distinct concept flows from the probable cause requirement.'" *United States v. Sanjar*, 853 F.3d 190, 200 (5th Cir. 2017). "Together, the two aspects of the Fourth Amendment require that (1) a warrant provide sufficient notice of what the agents may seize and (2) probable cause exist to justify listing those items as potential evidence subject to seizure." *Id.* While a search warrant must "describe the property to be seized with reasonable specificity," it need not do so with "elaborate detail." *United States v. Hill*, 19 F.3d 984, 987 (5th Cir. 1994) (citation omitted).

"[A] computer search may be as extensive as reasonably required to locate the items described in the warrant based on probable cause." *Triplett*, 684 F.3d at 505. When identifying property to be seized, "[s]ome interpretation [of the warrant] is unavoidable," and "[o]fficers are 'not obliged to interpret [it] narrowly.'" *Id.* at 504 (citation omitted). Even broad or generalized terms in a warrant may meet the particularity requirement in certain circumstances. *See id.* at 504-05 (finding "arguably vague terms" did not run afoul of the particularity requirement when included in a list of other items to be seized described in greater detail) (citations omitted); *United States v.*

*Loe*, 248 F.3d 449, 461-62 (5th Cir. 2001) (declining to suppress seized items or find agents' reliance on search warrant unreasonable where, though warrant contained "broad array of documents," there was a logical connection between the documents seized and those broad categories referenced in the search warrant); *Williams v. Kunze*, 806 F.2d 594, 598 (5th Cir. 1986) (holding "[w]here . . . all the records of a business are likely to constitute evidence, a warrant authorizing the seizure of all such records and describing them in generic terms is sufficient to meet the particularity requirement of the fourth amendment") (citations omitted).

The incorporation of an affidavit or itemized list with a search warrant may further strengthen particularity. *See Triplett*, 684 F.3d at 505 (holding "[t]he law permits an affidavit incorporated by reference to amplify particularity"); *United States v. Van Meter*, 280 F. App'x 394, 396 (5th Cir. 2008) (finding warrant had sufficient particularity where, although warrant broadly described "computer related equipment and materials," agent attached to the warrant an itemized list of records to be seized); *United States v. Beaumont*, 972 F.2d 553, 561 (5th Cir. 1992) (holding "where a warrant contains only the barest of generalized statements the particularity requirement is satisfied by reliance on an affidavit when the affidavit is incorporated by reference into the warrant").

### III. Analysis

#### A. Defendants USPlabs, LLC, Jonathan Doyle, Jacobo Geissler, and Matthew Hebert's Motion and Brief in Support of Their Motion to Suppress all Seized Digitally Stored Date (Doc. 377)

Defendants USPlabs, Geissler, and Hebert seek to suppress evidence seized by agents during the execution of warrants on November 6, 2013, at USPlabs' warehouse and at Geissler's home, as well as that seized pursuant to a warrant issued on November 26, 2013, for USPlabs' third-party e-

mail host, App River.[5]  Specifically, they move to suppress: all digitally stored records and data seized from USPlabs' warehouse facility, Geissler's home, and USPlabs' third-party e-mail host (App River), all of USPlabs' financial records, and any fruits thereof.  In support, their primary arguments are: (i) that the search warrants were constitutionally defective because they were overly broad, rendering them unconstitutional general warrants; and (ii) that the warrants did not justify the search for DMAA-containing products, as the scope of the warrants was limited to aegeline-containing products.  Doc. 377 at 6-10.

### 1.     Standing

The first issue that must be considered is whether Defendants have standing to challenge the warrants and resulting seizures under the Fourth Amendment.  "[A] claimant alleging a Fourth Amendment violation must have a cognizable Fourth Amendment interest—a concept known as Fourth Amendment standing."  *Barry v. Freshour*, 905 F.3d 912, 914 (5th Cir. 2018) (internal quotation marks omitted).  Under this rule, a defendant asserting a Fourth Amendment violation has the burden to show "a justifiable, a reasonable, or a legitimate expectation of privacy that has been invaded by government action."  *Id.*; *see also Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978) ("The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure." (citation omitted); *United States v. Turner*, 839 F.3d 429, 432 (5th Cir.  2016) (A defendant has the "burden of proving, by a preponderance of the evidence, that the evidence in question was obtained in violation of his Fourth Amendment rights.  That burden includes establishing standing to contest the evidence[.]") (internal punctuation and citations omitted);  *United States v. Iraheta*, 764 F.3d 455, 460-61 (5th Cir. 2014) (same).

---

[5] As previously noted, although Doyle also filed the motion to suppress, he has since entered into a plea agreement with the Government.

A business entity has a Fourth Amendment right against unreasonable searches and seizures. *See G.M. Leasing Corp. v. United States*, 429 U.S. 338, 353 (1977). Further, such reasonable expectation can exist in a business office with regard to business records. *See Mancusi v. DeForte*, 392 U.S. 364, 367-70 (1968) (union official who shared office with several other union officials had standing to challenge state officials' seizure of records in his custody at the time they were seized).

The Government contends that only USPlabs—and not Geissler or Hebert—has standing to challenge the search of USPlabs' business premises and the usplabsdirect.com e-mails stored with App River because neither Geissler nor Hebert has shown that the LLC is his personal alter ego. Doc. 403 at 5-6 (citing *United States v. Judd*, 687 F. Supp. 1052, 1055 (N.D. Miss. 1988), *aff'd*, 889 F.2d 1410 (5th Cir. 1989) (holding that a corporate officer did not have standing to challenge the search of corporate premises or corporate files)). The Government also notes that the Motion to Suppress contains no indication that Geissler or Hebert actually worked at USPlabs' headquarters to the extent that they had a reasonable expectation of privacy in the items that were seized there. With respect to challenges to the search and seizure at Geissler's home, the Government contends that while Geissler generally has standing to challenge the search of his home, he may not have standing to challenge the seizure of items he acknowledges belonged solely to his co-habitant Ruth Brewer, including her cellular telephone. Finally, the Government argues that Defendant Hebert lacks standing to challenge the search of Geissler's home.

In their Motion to Suppress, Defendants do not address standing . The only oblique reference to a reasonable expectation of privacy is an assertion in the brief that, given the company's "small size and their control over the privacy of their electronic data, Geissler . . . and Hebert often used their work computers and email accounts to engage in personal, non-USPlabs related business and affairs, and reasonably expected those communications to remain private." Doc. 377 at 1-2.

To the extent Defendants Geissler and Hebert seek to suppress their own private communications, unrelated to USPlabs' business and affairs, the court concludes they have a reasonable expectation of privacy in their private affairs and, thus, have standing to challenge the search of USPlabs' business premises and the usplabsdirect.com e-mails stored with App River. To the extent they are attempting to raise vicariously the Fourth Amendment rights of USPlabs, however, they lack standing to challenge the search of USPlabs' business premises and the usplabsdirect.com e-mails stored with App River, as they have made no attempt to meet their burden of demonstrating standing in this regard. *See Rakas*, 439 U.S. at 133-34 ("Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted."). With respect to the search of Geissler's home, the Government concedes that Geissler has standing to challenge the search. The court agrees with the Government that Hebert has failed to meet his burden of showing a reasonable expectation of privacy with respect to Geissler's home and, accordingly, he lacks standing to challenge that search. Whether Geissler has standing to challenge the seizure of items belonging to Ms. Brewer that were seized from his home was not adequately briefed by the parties, and the court will not address this issue.

As the Government does not challenge the standing of USPlabs to challenge the search of its own warehouse offices and its third-party e-mail host, App River, or Geissler's standing to challenge the search of his own home, the court turns to the merits of those challenges.

## 2.     Challenge to Warrants as Lacking Particularity and Being Overbroad

The court first addresses USPlabs' and Geissler's respective challenges to the validity of the warrants on the grounds that they are improper general warrants lacking in particularity, and, therefore, unconstitutional. USPlabs and Geissler contend:

Each of the Government's three seizures of digitally stored data—from USPlabs' facility, the Geissler home, and USPlabs' email host—was a blanket seizure of all data found. Despite the limited scope of the Magistrate Judge's probable cause finding, the warrants authorized, and the Government seized, all digitally stored data found—USPlabs' entire servers, Geissler's laptop computer, smart phones belonging to Geissler and USPlabs' lawyer, and the entirety of USPlabs' business email. The warrants do not limit the searches to be conducted on the seized material, and the Government is searching the entirety of the seized devices (both their data and forensic metadata) without restraint. These blanket seizures and searches amount to general seizures and searches under general warrants, in violation of the Fourth Amendment.

Doc. 377 at 8. In response, the Government contends that USPlabs and Geissler "misstate the pertinent law," and that Fifth Circuit precedent permits agents to seize the entirety of a digital device's contents and search those contents for documents falling within the scope of the warrant. Doc. 403 at 7. For the reasons that follow, the court determines that, under Fifth Circuit law, the warrants are not general warrants and, accordingly, rejects USPlabs' and Geissler's arguments to the contrary.

In *Triplett*, the Fifth Circuit specifically approved the government looking at all the files on a digital device—in that case, a computer hard drive—to determine whether those files fell within the scope of the items to be seized in the warrant. *Triplett*, 684 F.3d at 506 ("[I]n the end, there may be no practical substitute for actually looking in many (perhaps all) folders and sometimes at the documents contained within those folders."). Further, the protocol followed here appears similar to that approved in *Triplett*. *Id.* ("Nothing about this process violated the Fourth Amendment in a way requiring suppression."). In addition, magistrate judges in the Northern District Of Texas signed the warrants in this case, approving of that procedure ahead of time, as the warrants explicitly stated that the entire contents of digital devices in the subject premises would be seized and subject to off-site imaging and searching. *See supra* Sec. I(C). Moreover, as the Government correctly observes, other circuits are in accord with *Triplett*. *See* Doc. 403 at 8 (collecting cases).

In support of their argument that the warrants at issue were general warrants, and, therefore, unconstitutional, USPlabs and Geissler rely heavily on cases from outside this circuit, including *United States v. Wey*, 256 F. Supp. 3d 355, 365 (S.D.N.Y. 2017), and *United States v. Griffith*, 867 F.3d 1265, 1270 (D.C. Cir. 2017). In *Wey*, agents obtained a warrant authorizing seizure of a number of broad categories of records and the seizure or imaging of computers and digital storage devices as part of an investigation involving market manipulation. The *Wey* court suppressed the seized items, finding that a lack of particularity rendered the warrants invalid. *Wey*, 256 F. Supp. 3d at 386-87, 398-99. In *Griffith*, police officers obtained and executed a search warrant to seize "all cell phones and electronic devices" found at the suspect's home, "without regard to ownership." The court found the warrant constitutionally overbroad. *Griffith*, 867 F.3d at 1276.

These cases are from other circuits are not binding on this court. More importantly, they are distinguishable on closer examination. In *Wey*, unlike in this case, the warrant lacked particularity because it "did not specify the crimes under investigation, whether by statutory citation or otherwise, or discuss any particular conduct of interest." 256 F. Supp. 3d at 365. In *Griffith*, the warrant offered "no reason to suspect that Griffith in fact owned a cell phone, let alone that any phone belonging to him and containing incriminating information would be found in the residence," and the prosecution involved crimes different in kind from the ones described in the warrant. 867 F.3d at 1270. In addition, in *Griffith*, the warrant did not establish probable cause for a cell phone search when "the lion's share of the affidavit supporting the warrant application is devoted to establishing Griffith's suspected involvement as the getaway driver in a homicide[.]" *Id.* at 1271. USPlabs and Geissler also rely on the Supreme Court's decision in *Riley v. California*, 573 U.S. 373 (2014). *Riley* involved the reasonableness of a *warrantless search* incident to a lawful arrest, unlike this case in which all the searches were conducted pursuant to search warrants.

In contrast to the cases relied upon by USPlabs and Geissler, the warrants in this case, previously described in great detail, *see supra* Sec. I(C), established probable cause, described crimes, or closely related crimes, for which Defendants were indicted, contained lists of items to be seized that were related to those crimes, and were approved by Magistrate Judge Toliver (in the case of the warehouse warrant), by Magistrate Judge Horan (in the case of the residence warrant), and Magistrate Judge Stickney (in the case of the e-mail host warrant).

Further, insofar as USPlabs specifically challenges the warehouse warrant's authorization to seize the company's financial information, the warrant expressly authorized seizure of the financial information, which was related to USPlabs' purchase, shipments, and sales of potentially adulterated and misbranded products. The warrant affidavit set out probable cause to believe that a significant portion of the company's income was derived from illegal conduct. A warrant authorizing seizure of the business' financial records, therefore, was reasonable. *Kunze*, 806 F.2d at 598.

For these reasons, the court concludes that the warrants were not general warrants.[6]

### 3. Challenges to Scope of Search and Seizure

The court now considers USPlabs' and Geissler's respective contentions that the searches of USPlabs' warehouse and of Geissler's residence were unlawful because they exceeded the scope of the warrants. Both maintain that the property to be seized was identified as aegeline-containing

---

[6] To the extent USPlabs and Geissler challenge the warrants due to lack of protocols for filtering out irrelevant or privileged material, the court rejects this challenge, as it is without basis. The Fourth Amendment does not require search warrants to explain "the precise manner in which they are to be executed." *United States v. Grubbs*, 547 U.S. 90, 98 (2006) (quoting *Dalia v. United States*, 441 U.S. 238, 255 (1979)). "It would extend the Warrant Clause to the extreme to require that, whenever it is reasonably likely that Fourth Amendment rights may be affected in more than one way, the court must set forth precisely the procedures to be followed by the executing officers." *Dalia*, 441 U.S. at 258. As the Government correctly notes, forensic examiners may employ techniques that broadly expose all or most of a storage medium's contents to human inspection, even if only briefly, in order to locate data particularly described by the warrant. *See Triplett*, 684 F.3d at 506. Further, USPlabs and Geissler do not cite any authority for their assertion that a search warrant application must describe a procedure to filter out the target's potentially privileged material.

products, and that DMAA-containing products were outside the scope of the warrants.[7]  Having

examined the warrant for USPlabs' warehouse and the warrant for Geissler's home, the court

determines that USPlabs' and Geissler's respective arguments rest on a mischaracterization of the

two warrants and fail to take into account apposite Fifth Circuit law.

As previously explained, the warrant applications for USPlabs' warehouse and Geissler's

residence stated the Government was investigating USPlabs' use of an ingredient called aegeline.

The applications sought permission to seize products containing aegeline; records and

communications regarding such products; and financial records related to USPlabs and/or

aegeline-containing products.  *See* Doc. 377-3 (Ex. C to Motion to Suppress) (Warehouse App. ¶¶

36-42 & Att. B ¶¶ a-f); Doc. 377-4 (Ex. D to Motion to Suppress) (Home App. ¶¶ 37-40, 44 & Att.

B ¶¶ a-f ).  The premises warrants (the warrants executed on USPlabs' warehouse and Geissler's

residence) state:

> I respectfully submit that there is probable cause to believe that USP Labs
> used [the premises] to introduce and cause the introduction of adulterated food into
> interstate commerce, namely, their aegeline-containing products, and that fruits,
> instrumentalities, and evidence of violations of federal law, specifically 21 U.S.C.
> § 331 (causing the introduction of adulterated food into interstate commerce) and 18
> U.S.C. § 371 (conspiracy to cause the introduction of adulterated food into interstate
> commerce), will be found in the subject premises.

Doc. 377-3 at 28; 377-4 at 25 (emphasis added).  The warrant affidavits also detail the history of the

FDA's involvement with USPlabs, including a detailed account of how USPlabs continued to market

products containing DMAA after the FDA informed them that such supplements were illegal and

after USPlabs promised to take corrective action.  Doc. 377-3 at 14-16; 377-4 at 10, 11.  The

---

[7] The DMAA-related Counts of the Indictment are the wire fraud counts (Counts One through Four) and Count Seven, charging Defendants with conspiracy to introduce misbranded food into interstate commerce with an intent to defraud and mislead (as to all Defendants except Miles), in violation of 18 U.S.C. § 371 and 21 U.S.C. §§ 331(a), 333(a)(2).  Doc. 95 at 22-24.

affidavit explained that following a government enforcement action against Defendants' DMAA-containing products, Defendants began selling products with a different ingredient, aegeline, which was then implicated in a suspected outbreak of severe liver injuries. Doc. 377-3 at 15-17, 19-21; Doc. 377-4 at 11-12, 14-17, Doc. 377-5 at 10-11, 14-16.

USPlabs and Geissler also submitted a supplemental brief in further support of their argument that the warrant affidavits were limited to aegeline-containing products, and did not authorize the seizure of DMAA-containing products. *See* Supplemental Brief in Support of Their Motion to Suppress ("Supplemental Brief") (Doc. 552). They contend in the Supplemental Brief that during oral argument on an unrelated motion at a May 10, 2018 hearing before Magistrate Judge Toliver, the Government's lead counsel, Mr. Patrick Runkle, made the following statements indicating that the Government's investigation, previously focused on aegeline-containing products distributed by USPlabs (as the warrant applications themselves reflect), shifted in late-2014, to a new charging theory involving a different ingredient, DMAA:

> [W]e had a meeting here in Dallas *in August 2014* with USPLabs' prior corporate counsel, Peter Barton [Hutt]. And Peter Barton [Hutt] told us during that meeting -- that meeting, *we were mostly interested at that point in the case in the aegeline conduct* -- but Peter Barton [Hutt] told us during that meeting that USPLabs had never passed off its DMAA as a geranium extract in marketing or in labeling or in its promotional materials. And after that meeting, we investigated those claims and we decided, you know, we determined that they weren't true and that Peter Barton [Hutt] had told us things that were not accurate during that meeting. And so our focus of the investigation shifted at that point . . . .

Doc. 552, Ex. 1 (excerpt of transcript of oral argument) (emphasis in original).

USPlabs and Geissler contend that Mr. Runkle's comments confirm that almost ten months after the Government seizure of material, it pivoted to review seized material relating to DMAA, despite the fact that the warrant affidavits and the description of items to be seized did not support seizure of DMAA-related material. They argue that because the Government failed to obtain a later

search warrant to review this material, the subsequent searches violated Defendants' Fourth Amendment rights.

First, the lists of "items to be seized" in the two premises warrants include "any and all records . . . [and] any and all . . . correspondence or communication . . . related to . . . [the] formulation . . . of aegeline-containing products, including . . . OxyElite Pro." Doc. 377-3 at 6; 377-4 at 30 (emphases added). The "formulation" of USPlabs' aegeline-containing products OxyElite Pro-NF and AF was "related to" the company's DMAA-containing products, including Jack3d and OxyElite Pro, because aegeline was the company's replacement for DMAA. *See* Doc. 560 at Ex. A (Geissler describing to Patel in March 2012 how "aegelin" is "a replacement for 1,4/1,3 [DMAA] if needed."). Evidence submitted by the Government shows that Defendant predicted that DMAA might be forced off the market in response to news of adverse events. *See id.* at Ex. B (March 2010 discussion of what could happen "[o]nce someone gets hurt."). Evidence submitted by the Government also reveals that Defendants held the belief that multiple-stimulant products—a category that, at the time, included the DMAA products and later would include the aegeline products—could affect the liver, the same issue underlying the search warrants. *See id.* at Ex. C.

Further, the Government makes the following argument, which the court finds persuasive:

> The evidence regarding the defendants' products containing DMAA explains how and why the defendants' aegeline products were formulated the way they were. Evidence regarding the defendants' use of DMAA, and their decision to replace DMAA with aegeline, plainly is "related to" the "formulation" of the aegeline-containing products. Moreover, to a substantial extent, the formulation of the defendants' aegeline products was the formulation of the defendants' DMAA products, because many product ingredients remained the same as the defendants transitioned from DMAA to aegeline. Compare Ex. D with Ex. E (batch records showing six out of nine ingredients remained the same between the DMAA and aegeline versions of OxyElite Pro). The warrants explicitly allowed the seizure of DMAA-related evidence, whether or not it specifically mentioned "aegeline."

Doc. 560 at 3.

For these reasons, and those argued by the Government, the court rejects USPlabs' and Geissler's argument that the warrants are limited to seizure of materials explicitly mentioning aegeline.

In addition, even assuming USPlabs' and Geissler's characterization of the warrants were correct, the Government may seize evidence that is "reasonably related" to or bears a "sufficient nexus" to the crimes discussed in a warrant. *See, e.g., Gurleski v. United States*, 405 F.2d 253, 260 (5th Cir. 1968) ("A finding that the objects are reasonably related to the offense committed is all that is necessary under federal law."); *Creamer v. Porter*, 754 F.2d 1311, 1318 (5th Cir. 1985) ("[P]roperty that has a sufficient nexus to the crime being investigated may be seized at the time officers are properly executing a warrant authorizing a search for other items."); *United States v. Pena*, 418 F. App'x 335, 345-47 (5th Cir. 2011).

Even if the investigation at the time of the applications for the search warrants focused more on products containing aegeline, evidence regarding the fraudulent course of conduct alleged in the Indictment involving prior DMAA formulations of those misbranded and/or adulterated substances is "reasonably related" and bears a "sufficient nexus" to crimes more specifically involving aegeline. In short, under the above-cited Fifth Circuit law, evidence of non-aegeline formulation may be seized as "reasonably related to" or bearing a "sufficient nexus" to the crimes discussed in the warrants.

### 4.    Challenges Specific to App River Warrant

USPlabs argues that the Government's seizure of its e-mail from its e-mail service provider App River pursuant to a Stored Communications Act ("SCA") warrant violated its Fourth Amendment rights. In response, the Government contends it used the typical process for obtaining

the content of e-mail accounts pursuant to such a warrant and there was no Fourth Amendment violation. For the reasons that follow, the court agrees.

The Government's warrant application for USPlabs' third-party e-mail host, App River, to disclose the e-mails and related information is governed by the Stored Communications Act of 1986, 18 U.S.C. §§ 2701-2712. Warrants issued under the SCA are unlike Rule 41 warrants for the search of a premises. 18 U.S.C. § 2703. The Government did not use the App River warrant to physically enter, conduct a search, and seize property at App River's facilities. Instead, it obtained a warrant for certain of App River's records and transmitted the warrant to App River. App River then provided a response in the form of a hard drive. The SCA establishes this procedure and authorizes the United States to use such search warrants as compulsory process. Specifically, section 2703 of that statute authorizes the Government to obtain the "contents" of an "electronic communication" that is in "electronic storage" or held by a "provider of remote computing service"—such as e-mails—pursuant to a search warrant under the Federal Rules of Criminal Procedure. *See* 18 U.S.C. §§ 2703(a), 2703(b)(1)(A). As no property was taken in the traditional Fourth Amendment sense, the court concludes that no Fourth Amendment violation occurred.

Further, the seizure of entire e-mail accounts under an SCA warrant repeatedly has been upheld as reasonable under the Fourth Amendment, even assuming that traditional Fourth Amendment jurisprudence applies in this context. "[E]very case of which we are aware that has entertained a suppression motion relating to the search of an email account has upheld the Government's ability to obtain the entire contents of the email account to determine which particular emails come within the search warrant." *In the Matter of a Warrant for All Content & Other Info. Associated with the Email Account xxxxxxx gmail.com Maintained at Premises Controlled By Google, Inc.*, 33 F. Supp. 3d 386, 394 (S.D.N.Y. 2014), as amended (Aug. 7, 2014) (collecting cases

and analyzing SCA warrants under the Fourth Amendment). Having reviewed caselaw on the issue, the court agrees with the Government that the weight of authority supports the conclusion that a warrant that requires disclosure of the entire contents of an e-mail account and then describes a subset of that information that will be subject to seizure is reasonable. Further, USPlabs has failed to provide the court with any persuasive caselaw to the contrary.

For these reasons, the court concludes that the Government's procedure here was reasonable, and the App River SCA warrant did not violate the Fourth Amendment.

### 5. Application of Good Faith Exception to Exclusionary Rule

USPlabs and Geissler ask the court to suppress all evidence based on the argument that the Government also seized some irrelevant materials. Suppression of lawfully seized evidence is unwarranted as a matter of fact and law. Suppression is an extraordinary remedy in any case, used only as a "last resort," *Hudson v. Michigan*, 547 U.S. 586, 591 (2006), and only when its deterrent effect is "worth the price paid by the justice system," *Herring v. United States*, 555 U.S. 135, 144 (2009). "[T]he remedy with respect to any items exceeding the scope of the warrant would not have been invalidation of the search but suppression of those items." *United States v. Cook*, 657 F.2d 730, 735 n.5 (5th Cir. 1981). "[U]nder the 'severability' doctrine, items that are illegally seized during the execution of a valid warrant do not affect the admissibility of evidence legally obtained while executing the warrant." *United States v. Hamilton*, 931 F.2d 1046, 1054 (5th Cir. 1991). "Consequently, if a court finds that certain items were illegally seized, even though the warrant itself was not facially defective, the admissibility of the other legally seized items is unaffected." *United States v. Khalid*, 41 F.3d 661 (5th Cir. 1994).

As previously described, *see supra* Sec. I(C), the court authorized the seizure of the electronic

devices in this case. The affidavits in support of all three warrants unambiguously stated that the entire computers and digital devices would be seized and that the files would be examined. *See* Doc. 377-3 at 21-27; Doc. 377-4 at 18-24. As previously discussed, USPlabs' and Geissler's arguments that agents unreasonably exceeded the scope of a warrant is not persuasive. Further, the court agrees with the Government that, at the very least, the agents' "reliance on the warrant was objectively reasonable and in good faith," *Payne*, 341 F.3d at 399, and suppression would be improper under *Leon*, *supra*. A court evaluating the good faith exception under *Leon* looks objectively to "whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *Payne*, 341 F.3d at 400. After considering all the evidence and legal arguments presented, as well as USPlabs' and Geissler's focus on filter protocols that are not legally required, reliance on cases outside the Fifth Circuit that are clearly distinguishable, and failure to consider *Tripplett*, the court concludes that the agents' reliance on the warrants in this case was objectively reasonable and in good faith. For these reasons, the court will deny Defendants USPlabs, LLC, Jonathan Doyle, Jacobo Geissler, and Matthew Hebert's Motion and Brief in Support of Their Motion to Suppress all Seized Digitally Stored Date (Doc. 377).

## III.  Defendants' Requests for Evidentiary Hearings

Requests for evidentiary hearings are not granted as matter of course when requested by defendants. *United States v. Harrelson*, 705 F.2d 733, 737 (5th Cir. 1983). Whether an evidentiary hearing on a motion to suppress is required depends on the facts of a case that relate to a particular request, and district courts have a certain amount of discretion in deciding whether to grant or deny a request for an evidentiary hearing. *Id.* A defendant can obtain an evidentiary hearing if he or she alleged sufficient facts that, if proved, would justify relief. *United States v. Mergist*, 738 F.2d 645, 648 (5th Cir. 1984). Further, an evidentiary hearing is required only when necessary to receive

evidence on an issue of fact. *Harrelson*, 705 F.2d at 737. Here, USPlabs, Geissler, and Hebert request an evidentiary hearing on their Motion to Suppress. The Government contends that the motion may be decided without evidentiary hearings, as "[D]efendants allege no genuine factual dispute about the warrants or the execution of them that would justify a hearing on the USP[l]abs' suppression motion[.]" Doc. 403 at 18. Having reviewed the motion, response, evidence, and applicable law, the court agrees and, therefore, has ruled on the pending Motion to Suppress based on its careful consideration of the parties' submissions without conducting an evidentiary hearing.

## IV. Conclusion

For the reasons herein stated, the court **denies** Defendants USPlabs, LLC, Jonathan Doyle, Jacobo Geissler, and Matthew Hebert's Motion and Brief in Support of Their Motion to Suppress all Seized Digitally Stored Date (Doc. 377); **denies as moot** Defendants S.K. Laboratories' and Patel's Motion to Suppress Evidence Seized During the Eleven Month and Apparent Ongoing Search of Their Digital Data (Doc. 381); **denies as moot** Defendants' Joint Motion to Suppress Evidence Seized from the November 6, 2013 Search of 5420 E. La Palma Avenue, Anaheim, California Based Upon Overly Broad Warrant and Seizure and Lack of Probable Cause (Doc. 384); **denies as moot** Defendants' Joint Motion to Suppress iPhone and Digital Device Searches as Fruits of Passcode Statements Obtained in Violation of Fifth Amendment (Doc. 385); and **denies as moot** Defendants S.K. Laboratories, Inc. and Sitesh Patel's Joint Supplemental Motion to Suppress Evidence Seized from the November 6, 2013 Search of 5420 E. La Palma Avenue, Anaheim, California Based Upon Overly Broad Warrant and Seizure and Lack of Probable Cause (Doc. 386).

**It is so ordered** this 24th day of February, 2019.

Sam A. Lindsay
United States District Judge